## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| PACIFIC RANGER, LLC, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil No. 15-cv-509 (KBJ) |
| | ) | |
| PENNY SUE PRITZKER, *in her official* | ) | |
| *capacity as* Secretary of the United | ) | |
| States Department of Commerce, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## <u>MEMORANDUM OPINION</u>

Federal law recognizes that unregulated commercial deep-sea fishing operations can pose a threat to the survival of whales, dolphins, seals, and other marine mammals. To minimize the hazards, the Marine Mammal Protection Act ("MMPA"), 16 U.S.C. § 1361 *et seq.*, makes it unlawful for fishermen to "take" marine mammals, which includes not only hunting, capturing, or killing such animals, but also engaging in acts that constitute harassment. In the instant case, the captains, the fishing master, and the LLC associated with a commercial fishing vessel called the *Pacific Ranger* (collectively, "Plaintiffs") are challenging what they consider to be an unfair determination by the division of the Department of Commerce that enforces the MMPA—the National Oceanic and Atmospheric Administration ("NOAA")—that they

should be held civilly liable for their "takes" of whales on several occasions. Specifically, NOAA prosecutors filed six separate administrative charges against Plaintiffs in 2012, and after a hearing on the charges, an Administrative Law Judge ("ALJ") determined that Plaintiffs had violated the MMPA in the fall of 2010 when they set their fishing net on whales during five tuna-fishing expeditions, and that, on another occasion during this same timeframe, Plaintiffs had breached the Western and Central Pacific Fisheries Convention Implementation Act ("the Implementation Act"), 16 U.S.C. § 6901 *et seq.*, which is a law that prevents commercial fishermen from fishing near or employing "fish aggregating devices" ("FADs").  As a result of these violations, the ALJ held Plaintiffs liable for the payment of civil penalties totaling $127,000.  In the instant complaint, which Plaintiffs have brought against the Administrator of NOAA and the Secretary of Commerce in their official capacities, Plaintiffs assert that these civil penalties should be set aside or reduced because, among other things, the applicable MMPA regulations are unconstitutionally vague, none of the ALJ's liability findings are supported by substantial evidence, and the penalty amounts are contrary to law (either because they are excessive or were insufficiently justified).

Before this Court at present are the parties' cross-motions for summary judgment.  (*See* Pls.' Mot. for Summ. J. ("Pls.' Mot."), ECF No. 16; Defs.' Cross-Mot. for Summ. J. ("Defs.' Mot."), ECF No. 17.)  Plaintiffs insist that a statutory carve-out for "incidental" takes of marine mammals should have shielded them from MMPA liability and the ALJ erroneously ruled that it did not (or, alternatively, that they were not given fair warning that they were not entitled to this safe harbor).  (*See* Pls.' Mem.

in Supp. of Pls.' Mot. ("Pls.' Mem."), ECF No. 16-1, at 18–25.)[1]  Plaintiffs also

maintain that there was insufficient evidence to support the ALJ's factual findings, and

that the amount of the penalties the agency imposed was either unconstitutionally

excessive or arbitrary and capricious because the ALJ failed to explain sufficiently her

reasons for assessing those amounts.  (*See id.* at 25–45.)  In their cross motion,

Defendants assert that the ALJ properly interpreted the regulations, which are not

vague; that the ALJ's factual findings are supported by the sufficient quantum of

evidence; and that the penalties the ALJ imposed are both sufficiently explained and

fully in compliance with applicable constitutional standards.  (*See* Defs.' Combined

Opp'n to Pls.' Mot. & Mem. in Supp. of Defs.' Mot. ("Defs.' Mem."), ECF No. 18, at

21–46.)

   For the reasons explained fully below, this Court rejects Plaintiffs' contention

that an incidental-take authorization effectively immunizes commercial fishermen

against liability for knowing (albeit not purposeful) takes of marine mammals in the

course of their fishing operations.  To the contrary, the Court agrees with the ALJ, as a

matter of law, that knowing and intentional takes cannot be deemed incidental, and

thus, the Court concludes that the ALJ properly interpreted and applied the MMPA

regulations in a manner that comports with the applicable law.  Furthermore, this Court

finds that the ALJ's determination was supported by substantial evidence, and that none

of Plaintiffs' contentions regarding the excessiveness or opacity of the penalty

determination is persuasive, particularly given the highly deferential standard of

review.  Consequently, Plaintiffs' motion for summary judgment will be **DENIED**, and

---

[1] Page-number citations to documents the parties have filed refer to the page numbers that the Court's
electronic filing system assigns.

Defendants' cross-motion for summary judgment will be **GRANTED**.  A separate order consistent with this memorandum opinion will follow.

## I.  BACKGROUND

### A.  The MMPA And The Implementation Act

Congress created the MMPA to ensure that marine mammals are "protected and encouraged to develop to the greatest extent feasible commensurate with sound policies of resource management[.]"  *Black v. Pritzker*, 121 F. Supp. 3d 63, 89 (D.D.C. 2015) (internal quotation marks omitted) (quoting 16 U.S.C. § 1361(6)); *see also id.* (explaining that "the primary objective" of the management of such mammals "should be to maintain the health and stability of the marine ecosystem" (internal quotation marks and citation omitted)).  Because marine mammals often live near and feed on fish, protecting these mammals burdens the fishing industry to some degree.  With respect to the ever-present potential conflict between the "animals' and fisheries' interests[,]" however, there is no question that, under federal law, the "interest in maintaining healthy populations of marine mammals comes first[.]"  *Kokechik Fishermen's Ass'n v. Sec'y of Commerce*, 839 F.2d 795, 802 (D.C. Cir. 1988) (footnote omitted); *see also Fed'n of Japan Salmon Fisheries Co-op. Ass'n v. Baldridge*, 679 F. Supp. 37, 46 (D.D.C. 1987) ("The interests of the marine mammals come first under the statutory scheme, and the interests of the [fishing] industry, important as they are, must be served only after protection of the animals is assured." (internal quotation marks and citation omitted)), *aff'd sub nom. Kokechik Fishermen's Ass'n v. Sec'y of Commerce*, 839 F.2d 795 (D.C. Cir. 1988).

To this end, the MMPA establishes a "moratorium on the taking[,]" 16 U.S.C. § 1371, of "any marine mammal on the high seas[,]" *id.* § 1372(a)(1), and it specifically defines a "take" as "harass[ing], hunt[ing], captur[ing], or kill[ing]" any marine mammal (or attempting to do so), *id.* § 1362(13).  The MMPA further defines harassment to include "any act of pursuit, torment, or annoyance" that "has the potential to injure a marine mammal . . . in the wild" or "has the potential to disturb a marine mammal . . . in the wild by causing disruption of behavioral patterns," *id.* § 1362(18)(A).  Thus, federal law makes clear that to "take" a marine mammal includes "the restraint or detention of a marine mammal, no matter how temporary[.]"  50 C.F.R. § 216.3 (defining a "take").

Notably, per the MMPA and its implementing regulations, not all marine-mammal "takes" are equally blameworthy.  There are multiple exceptions to the liability that the background prohibition establishes; the one relevant here is the statutory exception for "the *incidental* taking of marine mammals in the course of commercial fishing operations[.]"  16 U.S.C. § 1387(a)(1) (emphasis added).  Congress has made clear that the Secretary of Commerce may grant "authorizations" under 16 U.S.C. § 1387 that immunize commercial fishermen for incidental takes.  *Id.* § 1371(a)(2); *see also id.* § 1362(12)(B) (designating the Secretary of Commerce as the official responsible for administering the MMPA for purposes of § 1387).[2]  To

---

[2] Congress has envisioned both "authorizations" and "permits" for incidental taking, and the specifications for each appear in different statutory provisions.  *See* 16 U.S.C. § 1371(a)(2) (explaining that "permits may be issued . . . under section 1374, while "authorizations may be granted . . . under section 1387").  Plaintiffs here have limited their MMPA-related arguments to the "authorizations" that they held at the relevant times.  (*See, e.g.*, Respondents' Hr'g Mem.; Marine Mammal Protection Act Issues, Admin. R. App. ("AR"), ECF Nos. 27-1–27-37, AR 000455 ("The legal and factual issues in this proceeding are to be decided under [16 U.S.C. § 1387].");  Joint Stipulation of Facts, AR 437 ¶ 8 (invoking only § 1387 as the relevant incidental-take exception);  Pls.' Mem. at 9 (discussing only § 1387);  *id.* at 19 ("[T]he 'incidental taking' of marine mammals during commercial fishing operations

implement this authorization authority, the Secretary evaluates the risk of mortality for marine mammals in various ocean areas that have been designated for commercial fishing—known as "fisheries"[3]—and categorizes each fishery based on the risk of harm that commercial fishing poses to marine mammals in that area.  *See* 16 U.S.C. § 1387(c).  Category I fisheries are those in which there is "frequent incidental mortality and serious injury of marine mammals[,]" *id.* § 1387(c)(1)(A)(i), while Category II fisheries have "occasional incidental mortality and serious injury of marine mammals[,]" *id.* § 1387(c)(1)(A)(ii), and in Category III fisheries, the "likelihood" of such incidents is "remote[,]" *id.* § 1387(c)(1)(A)(iii).  The MMPA states that the Secretary "shall" grant "[a]n authorization" to licensed commercial fishing vessels that operate in Category I or II fisheries and that register for such authorization, *id.* § 1387(c)(2)(A), and the statute expressly provides that "an authorization granted under this section shall allow the incidental taking of all species and stocks of marine mammals to which this chapter applies[,]" *id.* § 1387(c)(2)(C).

But the MMPA itself does not define "incidental," nor does it specify the circumstances under which one is deemed to have taken a marine mammal "incidentally."  *That* crucial definition appears in the regulations that implement the MMPA.  Section 229 of Title 50 of the Code of Federal Regulations—which pertains to "authorization[s] for commercial fisheries" under the MMPA, *see* 50 C.F.R. § 229 (capitalization altered), and explicitly implements the incidental-taking exception set

is permitted[.]" (citing only 16 U.S.C. § 1387)).)  This Court has limited its MMPA analysis accordingly.

[3] As a general matter, "fisheries" are "stocks of fish which can be treated as a unit for purposes of conservation and management[.]"  16 U.S.C. § 1362(16)(A).

forth at 16 U.S.C. § 1387, *see* 50 C.F.R. 229.1—specifically addresses the meaning of "incidental" when it states:

> *Incidental* means, with respect to an act, a non-intentional or accidental act that results from, but is not the purpose of, carrying out an otherwise lawful action.

*Id.* § 229.2 (emphasis in original).  Thus, per the MMPA and its implementing regulations, commercial fishing operators who receive authorization for incidental takes in the course of their operations, as described above, may avail themselves of the incidental-take safe harbor and avoid liability if their conduct is, in fact, incidental as defined by law.  By contrast, if a commercial fishing operation is not excused from the take prohibition in some manner, and nevertheless engages in conduct that qualifies as the taking of a marine mammal, the owners and operators face steep civil penalties that the agency may impose after notice and an opportunity for a hearing.  *See* 16 U.S.C. § 1375(a)(1) (setting civil penalty cap and hearing requirement); *see also* 15 C.F.R. § 6.4(e)(10) (2010) (setting statutory penalty cap at $11,000 to account for inflation).[4]

Although the Implementation Act differs from the MMPA insofar as it is not aimed specifically at protecting marine mammals, the Implementation Act addresses the depletion of fish stocks in particular areas of the western and central Pacific Ocean, *see* 16 U.S.C. § 6901(4), and thus it too bears upon the conduct of commercial fishing vessels operating in certain areas of the high seas.  Simply stated, the Implementation Act arose out of the United States' obligations as a signatory to the Convention on the Conservation and Management of Highly Migratory Fish Stocks in the Western and

---

[4] The penalties discussed in this Memorandum Opinion are those in effect when the conduct at issue in this matter occurred (i.e., in 2010).  Today, one who violates the MMPA in a manner that subjects him to liability under 16 U.S.C. § 1375(a)(1) is subject to a penalty of up to $27,500 per offense.  *See* 15 C.F.R. § 6.4(f)(11).

Central Pacific Ocean ("Convention"), Sept. 5, 2000, T.I.A.S. No. 13,115, which is a multilateral international agreement that is designed to "ensure . . . the long-term conservation and sustainable use of highly migratory fish stocks[,]" *id.* art. 2. (*See also* Initial Decision and Order of Administrative Law Judge ("ALJ's Decision"), ECF No. 27-13, at 6.) The Convention created the Commission for the Conservation and Management of Highly Migratory Fish Stocks in the Western and Central Pacific Ocean ("the Commission"), which is a multimember body that works to carry out the Convention's goals, *see* Convention, T.I.A.S. No. 13,115, arts. 9–10, and the Implementation Act effectuates the Convention within the United States by, among other things, authorizing the Secretary of Commerce to promulgate regulations "to carry out the United States['] international obligations under the . . . Convention[,]" 16 U.S.C. § 6904(a), and making it unlawful to violate any such regulations, *see id.* § 6906(a)(1). *See also id.* § 6901.

The key obligation here stems from a rule that the Commission issued in 2008, and the Commerce Department adopted in 2009. *See* International Fisheries; Western and Central Pacific Fisheries for Highly Migratory Species ("CMM 2008-01 Final Rule"), 74 Fed. Reg. 38544, 38544 (Aug. 4, 2009) (adopting Conservation and Management Measure 2008-01 ("CMM 2008-01")); (ALJ's Decision at 7). Among other things, CMM 2008-01 restricted fishing operations—during specified time periods in Convention-covered areas—near where certain fish aggregating devices ("FADs") were being used. *See* CMM 2008-01 Final Rule, 74 Fed. Reg. at 38544–45. (*See also* ALJ's Decision at 7).[5] As codified, CMM 2008-01 also required that certain types of

---

[5] FADs are, essentially, "any artificial or natural floating object, whether anchored or not and whether situated at the water surface or not, that is capable of aggregating fish, as well as any objects used for

commercial fishing vessels—such as the one Plaintiffs use—carry neutral third parties known as "fishery observers" (ALJ's Decision at 7) when the vessels were operating in certain areas. *See* CMM 2008-01 Final Rule, 74 Fed. Reg. at 38545–46. To comply with this requirement during the relevant time period, NOAA "utilized fishery observers provided by the Pacific Islands Forum Fisheries Agency . . . , an intergovernmental agency of Pacific Island nations created to facilitate and promote regional cooperation and coordination in marine fishery policy and management." (ALJ's Decision at 9–10.)

In 2010, the penalty provisions of the Magnuson-Stevens Fishery Conservation and Management Act applied to Implementation Act violations. *See* 16 U.S.C. § 6905(c) (2010). Those provisions set a maximum penalty of $140,000 for each violation, which could be assessed only after notice and an opportunity for a hearing. *See id.* § 1858(a) (setting penalty and notice and hearing requirement); 15 C.F.R. § 6.4(e)(14) (2010) (adjusting penalty to $140,000 for inflation).[6]

### B.    Background Facts

The *Pacific Ranger* is a type of ship that is known as a "purse seine" vessel. These commercial fishing ships employ a purse seine net, which is a specific kind of fishing net that is described as "a floated and weighted encircling net that is closed by means of a drawstring threaded through rings attached to the bottom[.]" *Black*, 121 F.

---

that purpose that are situated on board a vessel or otherwise out of the water." CMM 2008-01 Final Rule, 74 Fed. Reg. at 38554–55; 50 C.F.R. § 300.211 (2010). CMM 2008-01's bar on FAD-associated activities was called a "FAD Closure," and as pertinent here, it ran from July 1 through September 30 of 2010. (Joint Stipulation of Facts, AR 438 ¶ 15.)

[6] The applicable penalty structure differs today in ways that are not relevant to the instant case. Moreover, the maximum amount that can imposed for a violation of the Implementation Act today is $178,156. *See* 15 C.F.R. § 6.4(f)(15), (27).

Supp. 3d at 71 n.3 (internal quotation marks and citation omitted).  Purse seine nets are over half a mile long; therefore, purse seine fishermen use a host of smaller motor boats to extend the net around a school of fish and to seal it for loading back onto a vessel. (*See* Joint Stipulation of Facts, Admin. R. App. ("AR"), ECF Nos. 27-1–27-37, AR 000440 ¶ 32).  Additionally, purse seine fishing expeditions often employ a helicopter to assist with this process, which is called a "purse seine set" (ALJ's Decision at 10) and generally takes between two and four hours from start to finish.  (*See* Joint Stipulation of Facts, AR 000440 ¶ 32).  In the ocean areas in which the *Pacific Ranger* operates, the value of the fish that are caught in a single set can be immense; for example, the total value of the six sets at issue in the instant case was $122,531.90, and two of those sets produced no value.  (*See* ALJ's Decision at 38, 40–41.)  The record here reflects that the value of the fish that are harvested during a multi-day fishing trip for a purse seine vessel can be, on the low end, just under a million dollars.  (*See* Transcript of Proceedings Before Administrative Law Judge ("Transcript"), AR 001318.)

    The fisheries in the Pacific Ocean in which the *Pacific Ranger* operated at the relevant times were all designated as "Category II" fisheries (ALJ's Decision at 6), which meant that NOAA viewed them as areas in which "occasional incidental mortality and serious injury of marine mammals" occurs.  16 U.S.C. § 1387(c)(1)(A)(ii).  (*See* ALJ's Decision at 6.)  Moreover, during the time periods delineated in CMM 2008-01's FAD-closure rule, *see supra* note 5, purse seine fishing vessels in covered areas of the Pacific were not only barred from setting a purse seine net around or within one nautical mile of a FAD, but were also prohibited both from

setting a purse seine net in a manner "intended to capture fish that have aggregated in association with a FAD" and from deploying a FAD into the water.  CMM 2008-01 Final Rule, 74 Fed. Reg. at 38556; *see also* 50 C.F.R. § 300.223(b) (2010).

It is undisputed that the *Pacific Ranger* was operating in areas of the Western and Central Pacific Ocean covered by the FAD closure in the latter half of 2010.  (*See* ALJ's Decision at 33).  In 2012, NOAA charged Plaintiffs with six "counts" of violating the MMPA's take prohibition and the Implementation Act's FAD-closure rule, maintaining that, during their operations in 2010, Plaintiffs ran afoul of the MMPA and Implementation Act six times (*see id.* at 2).[7]  In short, the five MMPA charges stemmed from actions Plaintiffs took on August 21, 23, 25, October 18, and December 11, 2010, which are dates on which the *Pacific Ranger* had conducted a purse seine set that resulted in one or more whales being caught in the net but eventually breaking free before complete sealing.  (*See id.* at 2, 10–15.)  Plaintiffs concede that their actions on these occasions constituted "takes" of whales within the meaning of the MMPA.  (*See* Prelim. Tr. of Summ. J. Mot. Hr'g at 20–21; ALJ's Decision at 20.)  The single FAD-related count occurred on September 1, 2010, when the *Pacific Ranger* allegedly set its purse seine net near a raft (which qualifies as a FAD).  (*See* ALJ's Decision at 13–14.)[8] Plaintiff Matthew James Freitas was the ship's captain for every charged count except for the December 11 event; Plaintiff Joao Moniz served as the captain on that date.

---

[7] Plaintiffs here were the "Respondents" in the agency enforcement action.  (*See* ALJ's Decision at 43.) As mentioned earlier, one Plaintiff is technically the *Pacific Ranger* LLC; throughout, references to actions Plaintiffs took in 2010 refer to the crew of the ship as directed by the captains and fishing master.

[8] Depending on whether one uses the local time or Coordinated Universal Time, this count occurred either on September 1 or August 31.  (*See* ALJ's Decision at 13.)  For simplicity, the Court uses the local time of September 1.

(*See* Joint Stipulation of Facts, AR 000436 ¶¶ 3, 20–26.)  Plaintiff Tien Shih Su served as the vessel's "fishing master"—the "officer responsible for directing the crew and deploying/retrieving the fishing gear and catch during purse seine fishing operations"—on each of the cited occasions.  (*Id.* 000437 ¶ 4.)

After NOAA issued the charges, an ALJ was assigned to the matter and held a hearing, which took place on September 18, 2013.  This hearing officer then undertook to determine, first, whether the Plaintiffs' five takes of whales fit within the incidental-take exception and thus were covered by Plaintiffs' authorization for incidental takes, and second, whether Plaintiffs had, in fact, set a purse seine net around or within one nautical mile of a FAD.  (*See* ALJ's Decision at 20, 33.)  The evidence presented at the hearing included: the live testimony of the fishery observers who were present on board the boat during the events, the observers' contemporaneous notes and post-voyage interviews with NOAA officials, the ship captains' logbooks, the testimony of Captain Freitas, and the testimony of Robert Virissimo, who serves as the Vice President of Vessel Operations for the company the *Pacific Ranger* uses to hire fishing masters. (*See id.* at 3, 22, 24–25, 29.)  The ALJ considered the evidence presented, and on November 25, 2014, issued a 44-page decision that explained her conclusion that Plaintiffs were jointly and severally liable as charged for the five violations of the MMPA and one violation of the Implementation Act (through their violation of CMM 2008-01), and imposed various civil penalties that totaled $127,000.[9]

---

[9] The ALJ's Order assessed a penalty of $11,000 for each of the five MMPA counts and a penalty of $72,000 for the Implementation Act count.  (*See* ALJ's Decision at 39, 43); *see also* 15 C.F.R. § 904.107(a).

In her decision, the ALJ described at length the testimony and documentary evidence that bore on each of the six charges that had been filed against Plaintiffs.  (*See id.* at 9–16.)  Briefly, with respect to the MMPA counts, the ALJ explained that liability hinged on whether the agency could prove the allegations "by a preponderance of the evidence," and that, given the parties' stipulations that Plaintiffs were under the jurisdiction of the United States and had taken these mammals "on the high seas[,]" all that remained was the issue of whether the incidental-take exception applied.  (*Id.* at 19–20.)  The ALJ noted the agency's argument that the incidental-take exception was inapplicable because Plaintiffs had "knowingly" and "intentional[ly]" taken the whales.  (*Id.* at 32; *see also id.* at 20 ("The Agency contends that . . . [Plaintiffs] *saw* the whale or whales prior to setting the net, and *then*, *still* set the net, knowingly, on the whales[.]" (emphasis in original)).)  And she acknowledged that Plaintiffs had disagreed with the agency's position by objecting to the evidence the agency had offered regarding Plaintiffs' knowledge and intent on the ground that it was unpersuasive (*see id.* at 20), and by suggesting that, in any event, the incidental-take authorization excused even "knowing" sets on whales (*see id.* at 30 (reporting Plaintiffs' argument that the regulations should be interpreted to excuse "'incidental, intentional' takes[,] provided there is no lethal taking and no targeted species is involved" (citation omitted))).

In evaluating this dispute, the ALJ addressed each piece of evidence, examined both sides' framing of the issues, and considered the proper construction of the incidental-take safe harbor.  (*See id.* at 21–32).  And, ultimately, the ALJ agreed with NOAA that Plaintiffs had "knowingly" and "intentional[ly]" taken the whales, which in

her view meant that Plaintiffs' conduct fell outside the incidental-take exception.  (*Id.* at 32 ("[T]he Agency has shown by a preponderance of the evidence that Respondents, through the actions of the crew of the Vessel, knowingly set purse seine fishing gear on whales on the dates at issue . . . . These takes of marine mammals were not accidental, but instead were intentional takes not permitted under Respondents' . . . authorization to incidentally take pursuant to their commercial fishing operations[.]").)[10]

With respect to the single Implementation Act charge, the ALJ again observed that only one issue remained to be evaluated under a preponderance-of-the-evidence standard: whether the *Pacific Ranger* had, in fact, "set a purse seine net around a FAD or within one nautical mile of a FAD."  (*Id.* at 33.)  The parties told dueling stories in this regard—the agency relied on the testimony of the observer who was present on board the vessel on that date and who claimed that such a set had occurred, while the Plaintiffs attacked that observer's testimony as "unreliable and speculative[,]" and also offered circumstantial evidence they believed cut against the conclusion that they had set the net near a FAD as charged.  (*Id.* (citation omitted).)  After weighing the evidence and the parties' competing narratives, the ALJ concluded that the agency had shown by a preponderance of the evidence that the ship had indeed set on a FAD.  (*See id.* at 33–36.)

Additional details regarding the evidence presented to, and considered by, the ALJ are discussed in Part III below.  The short of it all is that, based on her consideration of the testimony and evidence presented at the hearing related to the

---

[10] The ALJ apparently intended to treat "knowing" and "intentional" synonymously.  (*See, e.g.*, ALJ's Decision at 32.)  This Court need not address the subtle nuances of the ALJ's view of the requisite mens rea however, because it is clear that the ALJ meant that Plaintiffs' actions in taking the whales fell outside the scope of the incidental-take exception because the takes were "not accidental[.]"  (*Id.*)

charges against Plaintiffs, the ALJ found that Plaintiffs were liable on all six counts (*see id.* at 43), and for reasons explained more fully in Part III.C, she imposed a penalty of $11,000 on each of the MMPA counts, and a $72,000 penalty on the FAD count, for a total of $127,000 (*see id.*).

### C.   Procedural History

On December 23, 2014, Plaintiffs asked the NOAA Administrator to review the ALJ's unfavorable decision.  (*See* Pet. for Administrator Review, AR 000902, 000921.) *See also* 15 C.F.R. § 904.273.  The Administrator summarily denied Plaintiffs' review request on March 18, 2015 (*see* NOAA Administrator's Order Denying Respondents' Petition for Administrative Review, AR 001138–39), which made the ALJ's decision the agency's final action, *see* 15 C.F.R. § 904.273(i).

On April 8, 2015, Plaintiffs filed the instant complaint, which alleges, in Count One, that "the MMPA [r]egulations are unconstitutionally vague" (Compl., ECF No. 1, ¶ 25), because Plaintiffs did not receive "fair notice" of the prohibited conduct. (Compl. ¶ 21; *see also id*. ¶ 24 ("The MMPA Regulations did not give fair notice because the agency did not specifically identify what 'intentional' activity was prohibited and not prohibited, particularly with respect to vessels possessing incidental take permits that authorize takes in the course of commercial fishing activities.").)  The complaint also asserts, in Counts Two and Three, that the ALJ's conclusion that they knowingly and intentionally set the net on whales, and that they set the net on or near a FAD, is not supported by substantial evidence (*see* Compl. ¶¶ 26–29), and that the ALJ's determination that they should be held liable despite their possession of an incidental-take authorization was arbitrary and capricious (*see id*. ¶¶ 30–32).  Finally,

15

the complaint claims that the penalties the ALJ imposed were unconstitutionally excessive (Count Four).  (*See* Compl. ¶¶ 33–36.)

Plaintiffs filed a motion for summary judgment in support of their complaint on August 20, 2015.  In their memorandum in support of the motion, Plaintiffs expand upon and clarify their theories of relief, which appear to fit into three general categories.  First, Plaintiffs make an argument regarding how the MMPA incidental-take carve-out, and the implementing regulations, should be interpreted; Plaintiffs say that the MMPA's background bar on "takes" of marine mammals should have been held not to apply to them as a matter of law, either because the ALJ interpreted "incidental" as defined in the regulations in a plainly erroneous way, or because the regulatory scheme, taken as a whole, is impermissibly vague regarding which actions remain prohibited.  (*See* Pls.' Mem. at 18–25.)  Second, although the complaint acknowledges that "Plaintiffs set on tuna schools that happened to be in the presence of whales" (Compl. ¶ 23), which is a fact that the ALJ found below (*see* ALJ's Decision at 21–22), Plaintiffs' summary judgment brief contends that the ALJ's conclusion that they "knowingly" and "intentionally" took the whales and set on a FAD lacked a substantial basis in evidence, because the ALJ rested her conclusions largely on the credibility of the (corroborated) testimony that the on-board fishery observers had provided.  (*See id.* at 25–40.)  Third, Plaintiffs object to the penalty amounts, either because they are unconstitutionally excessive or because, according to Plaintiffs, the ALJ did not explain the penalties sufficiently and thus they violated the APA.  (*See id.* at 40–45.)

Defendants' cross-motion for summary judgment, which was filed on October 16, 2015, responds to all of these assertions.  (*See* Defs.' Mem. at 21–46).  For

example, Defendants contend that the MMPA regulations permit, and perhaps even mandate, the ALJ's interpretation of the scope of the incidental-take authorization, and are not vague regarding what conduct is prohibited. (*See id.* at 21–29.) Furthermore, the agency argues that the ALJ's findings of fact easily satisfy the applicable highly deferential standard of review (*see id.* at 29–41), and that the penalties were both well explained and constitutionally permissible (*see id.* at 42–46).

These cross-motions became ripe on December 9, 2016, and this Court held a hearing on these motions on March 15, 2016.

## II.    LEGAL STANDARDS

Although cases under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–559, 701–706, are often resolved on cross-motions for summary judgment, it is well established that "the standard set forth in [Federal Rule of Civil Procedure 56] does not apply because of the limited role of a court in reviewing the administrative record." *ViroPharma, Inc. v. Hamburg*, 916 F. Supp. 2d 76, 79 (D.D.C. 2013) (internal quotation marks omitted) (quoting *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 89 (D.D.C. 2006)). That is, in administrative-law cases, the district court is tasked only with determining "whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Id.* (internal quotation marks and citation omitted); *see also Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) ("[W]hen a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal. The 'entire case' on review is a question of law." (footnote omitted) (citation omitted)).

The APA authorizes a court to "set aside" agency action when it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[,]" 5 U.S.C. § 706(2)(A), and plaintiffs ordinarily take any one of several tacks when attempting to make that showing.  Sometimes, a plaintiff will argue that a regulation that the agency relied upon does not actually authorize the action taken, for example.  Under the legal standard that the Supreme Court enunciated in *Auer v. Robbins*, 519 U.S. 452 (1997), "when an agency interprets 'its own ambiguous regulation[s],' courts will defer to that interpretation unless it is 'plainly erroneous or inconsistent with the regulation[s][,]' or there 'is reason to suspect that the agency's interpretation does not reflect the agency's fair and considered judgment on the matter in question.'"  *Otsuka Pharm. Co. v. Burwell*, No. 15-1688, 2016 WL 4098740, at *7 (D.D.C. July 28, 2016) (alterations in original) (quoting *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166 (2012)).  Accordingly, "'an agency's interpretation need not be the only possible reading of a regulation—or even the best one—to prevail[,]'" *id.* (quoting *Decker v. Nw. Environ. Def. Ctr.*, 133 S. Ct. 1326, 1337 (2013)), and an agency's view of a regulation's meaning controls "unless an alternative reading is compelled by the regulation's plain language or by other indications of the [agency's] intent at the time of the regulation's promulgation[,]" *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (internal quotation marks and citation omitted).

In a related vein, a plaintiff might also contend that the agency's action is invalid because it was taken pursuant to a regulation that is unconstitutionally vague.  The void-for-vagueness test is relatively straightforward: if the "regulation delineated its reach in words of common understanding[,]" it passes muster.  *Throckmorton v. Nat'l*

*Transp. Safety Bd.*, 963 F.2d 441, 444 (D.C. Cir. 1992) (internal quotation marks and citations omitted); *see also Am. Coal Co. v. Fed. Mine Safety & Health Review Comm'n*, 796 F.3d 18, 28 (D.C. Cir. 2015) (explaining that a regulation need only "provide sufficient guidance so that reasonable regulated parties, aware of the goal the regulation seeks to accomplish, have 'fair warning' of what the regulation requires." (quoting *Freeman United Coal Mining Co. v. Fed. Mine Safety & Health Review Comm'n*, 108 F.3d 358, 362 (D.C. Cir. 1997)).

Plaintiffs also sometimes rest their challenges upon the foundational principle that "[n]ot only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." *Tripoli Rocketry Ass'n, Inc. v. ATF*, 437 F.3d 75, 77 (D.C. Cir. 2006) (internal quotation marks omitted) (quoting *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998)).  This standard is rooted in the "arbitrary and capricious prong" of the APA's judicial-review provision, which enforces a requirement of "reasoned decisionmaking" and requires courts to "ensure that [the agency] has examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 839 (D.C. Cir. 2006) (second and third alterations in original) (internal quotation marks and citations omitted); *see also Fox v. Clinton*, 684 F.3d 67, 74–75 (D.C. Cir. 2012) ("To survive arbitrary and capricious review, an agency action must be the product of reasoned decisionmaking." (citations omitted)). In addition, under some circumstances, the APA may require a reviewing court to ensure the agency's action is supported by "substantial evidence[,]" 5 U.S.C.

§ 706(2)(E), which is a deferential standard that typically "require[s] [an] equivalent level[] of scrutiny" as the arbitrary-and-capricious standard, *Black*, 121 F. Supp. 3d at 76 (internal quotation marks omitted) (quoting *Mem'l Hosp./Adair Cty. Health Ctr., Inc. v. Bowen*, 829 F.2d 111, 117 (D.C. Cir. 1987)); *see also Bangor Hydro-Elec. Co. v. FERC*, 78 F.3d 659, 663 n.3 (D.C. Cir. 1996).[11]

The long and short of it is that, whether a court is viewing an agency decision through the lens of arbitrary-and-capricious action or evaluating it per the substantial-evidence test, a great deal of deference is afforded to the agency's findings and conclusions. *See Van Hollen, Jr. v. FEC*, 811 F.3d 486, 495 (D.C. Cir. 2016) (describing the arbitrary-and-capricious standard); *Black*, 121 F. Supp. 3d at 76–77 (collecting cases describing substantial-evidence standard); *see also Ind. Mun. Power Agency v. FERC*, 56 F.3d 247, 254 (D.C. Cir. 1995) (explaining that the role of the federal court reviewing agency action is not to reweigh evidence, but to ensure only that the agency factfinder stayed within the bounds of rationality (citing, *inter alia*, *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983))). Indeed, under arbitrary-and-capricious review, courts "presume the validity of the agency's action," *Grid Radio v. FCC*, 278 F.3d 1314, 1322 (D.C. Cir. 2002) (internal quotation marks and citation omitted), and may not "substitut[e] [their] judgment for that of the agency[,]" *Van Hollen, Jr.*, 811 F.3d at 495; *see also Bean Dredging, LLC v. United States*, 773 F. Supp. 2d 63, 73 (D.D.C. 2011) ("[A] court need not find that the

---

[11] Because of the well-established similarity between the arbitrary-and-capricious standard and substantial-evidence review, *see, e.g.*, *Consumers Union of U.S., Inc. v. FTC*, 801 F.2d 417, 422 (D.C. Cir. 1986), and also because the arbitrary-and-capricious standard applies to "all agency actions subject to" the APA, *Verizon Cal., Inc. v. FCC*, 555 F.3d 270, 273 (D.C. Cir. 2009) (citation omitted), this Court need only assume, without deciding, that the substantial-evidence standard applies to its review of the entirety of the ALJ's conclusions in this case (as the parties have done).

agency's decision is 'the only reasonable one, or even that it is the result [the court] would have reached had the question arisen in the first instance in judicial proceedings.'" (second alteration in original) (quoting *Am. Paper Inst., Inc. v. Am. Elec. Power Serv. Corp.*, 461 U.S. 402, 422 (1983))).  And courts applying the "substantial evidence" standard have explained that an "agency decision may be supported by substantial evidence even though a plausible alternative interpretation of the evidence would support a contrary view[,]" *Morall v. DEA*, 412 F.3d 165, 176 (D.C. Cir. 2005) (internal quotation marks and citation omitted); that is, reversal of the agency's findings is appropriate on this ground "only when the record is so compelling that no reasonable factfinder could fail to find to the contrary," *Orion Reserves Ltd. P'ship v. Salazar*, 553 F.3d 697, 704 (D.C. Cir. 2009) (internal quotation marks and citation omitted).

Finally, it is clear that a plaintiff may challenge the monetary penalties that an agency assesses on the grounds that they are unconstitutionally excessive.  *See Collins v. SEC*, 736 F.3d 521, 526 (D.C. Cir. 2013) ("A civil penalty violates the Excessive Fines Clause [of the Eighth Amendment] if it 'is grossly disproportional to the gravity of' the offense." (quoting *United States v. Bajakajian*, 524 U.S. 321, 334 (1998))).  Relatedly, a plaintiff's APA claim may contend that insufficient reasons were given for a penalty imposed; that sort of claim is subjected to the arbitrary-and-capricious review standards outlined above.  *See id.* at 524 (citing *State Farm*, 463 U.S. at 43).

## III.   ANALYSIS

The owner and operators of the *Pacific Ranger* have requested the reversal or reduction of the substantial civil penalties that the ALJ has imposed upon them for "taking" whales, and for setting once on a FAD, based on myriad assertions of law and

fact.  But it is clear to this Court that Plaintiffs primarily seek to advance an overarching contention that lies at the root of each of their MMPA-focused claims of error: that the incidental-take authorization that Plaintiffs possessed as operators of a commercial fishing vessel allowed them to take whales and other marine mammals in the course of their fishing operations *so long as they did not purposefully set out to do so*, and thus the ALJ was wrong to conclude that Plaintiffs were deprived of the incidental-take authorization's protection based on their mere *knowledge* that "whales were in the area" when the *Pacific Ranger*'s purse seine net was set.  (Pls.' Mem. at 20; *see also id.* at 19 (emphasizing that "Plaintiffs possess a NOAA-issued authorization for the incidental taking of marine mammals in the course of their commercial fishing operations" (citation omitted)); *id.* at 20 ("[T]here is no claim that Plaintiffs had 'the purpose of' taking whales . . . . Rather, their purpose solely was to catch fish.  Nor is there any claim that Plaintiffs targeted whales in any respect during the course of the challenged purse seine fishing operations." (citation omitted)); Compl. ¶ 23 (asserting that "[t]he MMPA charges against Plaintiffs involved situations where Plaintiffs set on tuna schools that happened to be in the presence of whales" and "did not involve any situation where Plaintiffs chased or targeted the whales and then set on the tuna").

Nearly all of Plaintiffs' arguments flow from this characterization of what the law prohibits and permits.  For example, Plaintiffs insist that "the MMPA prohibits 'intentional' takings of marine mammals, while allowing those takings that are 'incidental'" (Pls.' Mem. at 21), and as a result, they say that it was plain error for the ALJ to conclude that the safe harbor for incidental takes did not absolve their knowing (but not purposeful) take of whales (*see id.* ("From the undisputed evidence, the takings

at issue in this case should have been classified as 'incidental.'")).  Alternatively, Plaintiffs maintain that if the law is such that an incidental-take authorization does *not* authorize the knowing (but not purposeful) taking of marine mammals, then the MMPA scheme is too vague to provide fair warning regarding what conduct is permitted, and should be struck down on that basis.  (*Id.* at 20 ("Plaintiffs would have no way of knowing that mere awareness of a whale in the vicinity of a tuna set can constitute an unlawful 'intentional' taking of that whale.").)

Similarly, the primary impetus behind Plaintiffs' claim that the ALJ's MMPA-related liability finding is not supported by substantial evidence appears to be Plaintiffs' belief that "the evidence falls significantly short in showing that they *purposefully* or intentionally targeted the whales in order to catch fish."  (*Id.* at 30 (emphasis added); *see also id.* at 32 (arguing that "[t]he ALJ took a broad leap from the secondhand testimony of the observers to the conclusion that Plaintiffs purposefully targeted the whales as part of making the sets"); *cf. id.* at 43 (decrying "the lack of direct evidence that Plaintiffs intentionally targeted the whales").)  And even the complaint's excessive-penalty claim seems to be partly derived from Plaintiffs' assertion that only those authorized commercial fishing operations that purposefully or intentionally chase or target whales and other marine mammals are truly deserving of punishment.  (*See, e.g.*, *id.* at 42 (arguing that "charging the maximum penalty ignores the realities of purse seine fishing[,]" which involves "conditions in the open ocean" that are "constantly changing and uncontrollable[,]" and within which "[w]hales a[nd] tuna are necessarily in the same area[,] as both the tuna and whales feed on the same school fish"); *see also id.* ("If the maximum penalty is charged here, . . . there is

nothing left to distinguish a case where someone intentionally and maliciously seeks out and/or kills the whales while setting on tuna.").)

For the reasons explained below, this Court disagrees with Plaintiffs' core characterization of the MMPA authorization scheme as being one that authorizes commercial fishermen to take marine mammals in the course of their fishing operations except insofar as they *purposefully* chase or target marine mammals in the process.  To the contrary, the law clearly establishes that any and all takes are categorically prohibited, and that only accidental or non-intentional (i.e., unknowing) takes are permissible per an incidental-take authorization.  Therefore, the MMPA scheme is not at all vague regarding what is expected, and the ALJ's conclusion that a knowing and intentional (i.e., deliberate) set upon a whale fails to qualify as an incidental take was not erroneous, much less plainly so.  (*See infra* Part III.A.)  Furthermore, when the incidental-take bar is properly set at excusing only accidental or non-intentional takes, then the dearth of record evidence establishing that the crew of the *Pacific Ranger* purposefully targeted the whales they took is of no moment, and the only issue becomes whether there is some support in the record for the ALJ's conclusion that Plaintiffs knew that whales were in the area when they set the purse seine net and did so anyway, and also set on a FAD on the date in question.  (*See infra* Part III.B.)  Finally, as explained in Part III.C, the Court's rejection of Plaintiffs' view of the applicable legal standard renders unpersuasive Plaintiffs' argument that the various penalties the ALJ imposed were inexplicable and unconstitutionally excessive.

**A.      The MMPA Scheme Is Not Vague, And The ALJ Did Not Err In Concluding That A Knowing Or Intentional Take Of A Marine Mammal Falls Outside Of The Incidental-Take Exception**

Plaintiffs' opening salvo is their claim that "the agency's interpretation of

'incidental' in this case is inconsistent with the plain language of its own regulations, or otherwise the regulations themselves are hopelessly (and unconstitutionally) vague." (Pls.' Combined Reply in Supp. of Pls.' Mot. for Summ. J. and in Opp'n to Defs.' Cross-Mot. for Summ. J. ("Pls.' Reply"), ECF No. 23, at 6; *see also* Compl. ¶¶ 20–25, 30–32.)  As noted above, courts generally afford *Auer* deference to an agency's interpretation of its own regulations, overturning the agency's interpretation only if it is plainly erroneous, but as it turns out, Defendants here need not rely on that deferential standard to overcome Plaintiffs' vigorous challenge to NOAA's interpretation of the MMPA regulations, because the plain text of the applicable provisions clearly establish that it is *Plaintiffs'* view—not the agency's—that is mistaken.

In short, as demonstrated below, Plaintiffs have erected a false dichotomy— prohibited "intentional" takes, on the one hand, versus authorized "incidental" takes on the other—to bolster their contention that an authorization for incidental takes covers more conduct than it actually does.  (*See* Pls.' Mem. at 21 (suggesting that the incidental-take authorization excuses all but the act of purposefully chasing or targeting marine mammals, because "the MMPA prohibits 'intentional' takings of marine mammals, while allowing those takings that are 'incidental'").)  However, as the text of the MMPA and its implementing regulations make clear, the prohibited act of taking a marine mammal is a strict-liability offense that is broadly defined, and the only takes that are properly deemed "incidental" to commercial fishing activity are those that are accidental or unknowing.  This means that the ALJ's interpretation of the incidental-take definition was clearly correct, and there is nothing vague, much less unconstitutionally so, about the expected course of conduct.

1. <u>The Plain Text Of The MMPA And Its Implementing Regulations</u>
   <u>Establishes That Only Accidental Or Non-Intentional (Unknowing) Takes</u>
   <u>Qualify As Incidental</u>

Returning to the nuts and bolts of the statutory scheme described above, the

MMPA establishes an unconditional ban on the taking of a marine mammal, which is

defined to include harassment and a host of other acts.  *See* 16 U.S.C. § 1362(13).  Any

"act of . . . annoyance" that "has the potential to injure" or "disturb" a wild marine

mammal counts as harassment, *id.* § 1362(18)(A), and because the statutory take

prohibition makes no reference to any required *mens rea*, *see id.* § 1372(a)(1), it is in

the nature of a strict-liability provision.  *Cf. W. Fuels-Utah, Inc. v. Fed. Mine Safety &*

*Health Review Comm'n*, 870 F.2d 711, 713 (D.C. Cir. 1989) (observing that "[s]trict

liability alters th[e] general rule" that liability is only imposed on one who acts with a

particular intent "by eliminating the requirement of *mens rea*").  To be sure, there are

exceptions to the broad and unconditional take prohibition, including the one for

"incidental taking . . . in the course of commercial fishing operations[,]" 16 U.S.C.

§ 1387(a)(1).  However, as mentioned above, via regulations explicitly implementing 16

U.S.C. § 1387, the Secretary of Commerce has explained that "incidental" means, "with

respect to an act, a *non-intentional* or *accidental* act that results from, but is not the

purpose of, carrying out an otherwise lawful action."  50 C.F.R. § 229.2 (emphasis

added).

Thus, this Court has no doubt that the safe harbor for "incidental" takes exempts

only a narrow slice of the takes that are otherwise proscribed, and that, by using the

words "accidental" and "non-intentional," the Secretary meant to place *deliberate* takes

outside the exception.  It is axiomatic "that words of statutes or regulations must be

given their 'ordinary, contemporary, common meaning.'"  *FTC v. Tarriff*, 584 F.3d

1088, 1090 (D.C. Cir. 2009) (quoting *Williams v. Taylor*, 529 U.S. 420, 431 (2000)).

And according to Black's Law Dictionary, accidental means "[n]ot having occurred as a

result of anyone's purposeful act[,]" while "intentional" means "[d]one with the aim of

carrying out the act."  Black's Law Dictionary 18, 932 (10th ed. 2014).  Applied to the

"take" context, the terms "accidental" and "non-intentional" therefore plainly do *not*

describe the harassment of whales that occurs when commercial fishermen *know* that

whales are in the vicinity of where they wish to conduct a highly disruptive multi-hour

tuna-fishing operation and nevertheless press on with that operation.

Plaintiffs disagree, arguing that when the regulation describes an "incidental"

act, it unambiguously refers only to actions that the fishermen set out to do and wished

to effect; in other words, in Plaintiffs' view, the incidental-take authorization

immunizes one who knowingly conducts a purse seine set on a school of fish that is

intermixed with whales unless bothering the whales is his subjective goal.  (*See, e.g.*,

Pls.' Mem. at 22 ("[A] taking is permitted, so long as it is not the purpose of the

activity and instead is a mere consequence of steps that are incidental to lawful

commercial fishing operations." (internal quotation marks omitted)); *see also id.* ("At

most, the evidence shows that Plaintiffs set on tuna that were associated with whales

[and] such conduct is expressly permitted[.]" (internal quotation marks omitted));

Respondents' Hr'g Mem.; Marine Mammal Protection Act Issues, AR 000457 (arguing

below that the incidental-take exception would authorize an intentional set on a marine

mammal).)  But this contention rests on the misapprehension that Congress was only

concerned about prohibiting "intentional" takings to begin with, when, in fact, the

MMPA speaks in categorical terms—"[t]here shall be a moratorium on the taking . . . of

marine mammals[,]" 16 U.S.C. § 1371(a)—and Congress has only countenanced carefully crafted exceptions to that blanket rule.

Once it is understood that all takings of marine mammals are prohibited by statute and that only certain takings are excepted as incidental, a straightforward question emerges: does a legal provision that immunizes "non-intentional or accidental [takings] that result[] from, but [are] not the purpose of, carrying out an otherwise lawful action[,]" 50 C.F.R. § 229.2, excuse *any* taking "so long as it [wa]s 'not the purpose of' the activity and instead [wa]s a mere 'consequence' of steps that are incidental to lawful commercial fishing operations" (Pls.' Mem. at 22)?  Merely posing this question answers it, for at least two reasons.  First, looking at the plain text of the regulation, an interpretation that would deem all takes "incidental" except those that are purposeful effectively renders the first part of the "incidental" definition a nullity, because all that matters is what the second half of the definition speaks to—whether the take "result[ed] from, but [was] not the purpose of, carrying out an otherwise lawful action."  50 C.F.R. § 229.2.  It is well established that regulatory interpretations that produce surplusage are disfavored, *see Oceana, Inc. v. Pritzker*, 75 F. Supp. 3d 469, 484 (D.D.C. 2014) (citing *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 668–69 (2007)), and Plaintiffs never explain why the agency included the words "non-intentional or accidental" in the "incidental" definition if the only relevant touchstone is whether it was the actor's purpose to effect the forbidden result.

Second, the broader statutory and regulatory context confirms that the phrase "non-intentional or accidental" does important work within the "incidental" take definition.  *See Simmons v. ICC*, 829 F.2d 150, 156 (D.C. Cir. 1987) (explaining that,

when interpreting a regulation, the court must consider "the context of the regulation of a whole"). This Court has already discussed some of that critical context. The MMPA proceeds from the premise that takes of marine mammals (broadly defined) are taboo, *see* 16 U.S.C. §§ 1371, 1372(a), which corresponds with the principle that, when in conflict, the wellbeing of marine mammals takes precedence over fishing interests. *See Kokechik*, 839 F.2d at 802. Moreover, the MMPA's broad prohibition against takes not only confirms Congress's interest in protecting marine mammals, it also clearly conflicts with Plaintiffs' suggestion that the Secretary meant to gut the MMPA's protections by shielding via regulation those commercial fishermen who obstinately push on with a purse seine set despite knowing that whales are in the area and are likely to be impacted, and who consequently harass (and even temporarily catch) those whales.

Consider, too, the fact that the phrase "non-intentional or accidental" substantially limits the number of takes that are properly cloaked with "incidental" immunity, which aligns with the thrust of the statutory provision that governs incidental takes, the bulk of which is devoted to *minimizing* their negative effects. *See, e.g.*, 16 U.S.C. § 1387(a)(1), (d), (f). By contrast, Plaintiffs' reading could effectively *incentivize* negative behavior, because a fisherman who acts in a manner that risks the taking of marine mammals—such as knowingly setting his nets in the water on top of any such animal if that animal happens to be in the way of the lucrative catch he desires—would not be held liable for those actions. Indeed, by limiting liability to only those commercial fishermen who *target* marine mammals, or deploy their nets *hoping* to harass whales, Plaintiffs' construction would effectively transform the incidental-take

authorization into a blanket of immunity for any fisherman who would rather not be bothered with the wellbeing of marine mammals while he fishes, and thereby perversely shifts the significant costs of risky fishing behavior away from the fishermen and onto the animals themselves.

Undaunted, Plaintiffs insist that definitions located in *other* MMPA-related regulations—specifically, those found in Part 216 of Title 50 of the Code of Federal Regulations—should govern this Court's analysis of what "incidental" means in the context of the incidental-take authorization established in 16 U.S.C. § 1387.  Plaintiffs identify two such definitions: (a) "[i]ncidental catch"—which is defined as "the taking of a marine mammal (1) because it is directly interfering with commercial fishing operations, or (2) as a consequence of the steps used to secure the fish in connection with commercial fishing operations"—and (b) "[i]ntentional purse seine set[,]" which occurs when "a tuna purse seine vessel or associated vessels chase marine mammals and subsequently make a purse seine set."  50 C.F.R. § 216.3 (emphasis omitted).  Boiled to bare essence, Plaintiffs' argument is that, because their conduct (allegedly) fits the definition of "incidental catch" and does not fit the definition of "intentional purse seine set," their actions must have been "incidental" for the purposes of § 1387's safe harbor.  (*See* Pls.' Mem. at 22 (quoting 50 C.F.R. § 229.2 and 50 C.F.R. § 216.3, while asserting that "[t]hese definitions are clear that a taking is permitted, so long as it is not the purpose of the activity and instead is a mere consequence of steps that are incidental to lawful commercial fishing operations" (internal quotation marks omitted)); *id.* at 23 ("[A]n 'intentional purse seine set' did not occur here because Plaintiffs did not 'chase' the whales[, and]. . . it follows that no 'intentional' taking of whales occurred.").)

Plaintiffs' attempts to rely on these definitions to bolster their view of the scope of the incidental-take authorization fails for at least two reasons.  First of all, neither of the terms that Plaintiffs point to appears in § 1387, and in any event, the well-established statutory maxim that 'the specific governs the general' also applies to the regulatory context.  *See Tasker v. DHL Ret. Sav. Plan*, 621 F.3d 34, 43 (1st Cir. 2010); *see also RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2071 (2012) (describing and discussing the maxim).  It is Part 229 of the Code of Federal Regulations—rather than Part 216—to which a reader must look in order to see what the agency intended regarding the incidental-take exception, *see* 50 C.F.R. § 229.1(a) ("The regulations in this part implement section[] 118 of the [MMPA, 16 U.S.C. § 1387.]"); *see also id.* § 229.1(b); thus, while other definitions in other parts of the MMPA regulatory regime generally use the word "incidental," the specific definition in Part 229 is undoubtedly the one that governs the dispute at issue here.[12]

Second, and similarly, it is not at all clear that the other definitions that Plaintiffs seek to rely upon actually relate to the incidental-take exception context.  For example, as has been repeatedly noted, the MMPA prohibits "takes" of all kinds, and a prohibited take can occur in many ways.  Thus, a regulation that pertains to an "incidental catch,"

---

[12] Plaintiffs' invocation of an online agency glossary that defines "incidental taking" as an "unintentional, but not unexpected, taking" (Pls.' Mem. at 23 (internal quotation marks and citation omitted)), fails for this same reason.  Plaintiffs cite no authority for the proposition that an informal glossary definition can supersede the otherwise plain meaning of a regulation, and only the latter is perceived as having "controlling weight[.]"  *High Plains Wireless, L.P. v. FCC*, 276 F.3d 599, 606 (D.C. Cir. 2002) (internal quotation marks and citation omitted); *see, e.g., Duckworth v. United States ex rel. Locke*, 705 F. Supp. 2d 30, 47 (D.D.C. 2010) (stating that an agency's informal instructions to fishermen "d[id] not supersede the definition of 'fishing' that is clearly stated in the statutes and regulations themselves"), *aff'd*, 418 F. App'x 2 (D.C. Cir. 2011).  What is more, this glossary definition is entirely consistent with a view of the regulation that excuses only truly "accidental" or "non-intentional" conduct, which does not encompass deliberate and knowing deployment of nets on fish that are intermingled with whales.

or that clarifies that Plaintiffs' conduct qualifies as an incidental catch for Part 216's purposes, says little about whether a take that is intentional or knowing can still be deemed "incidental" within the meaning of the Part 229 definitions.  Put another way, even when the other definitions that Plaintiffs seek to rely upon are taken into account, the inquiry always returns to the question of what the phrase "non-intentional or accidental" means in the Part 229 definition of "incidental," and under what circumstances one who is otherwise liable for a take is saved by this exception.  And in this Court's view, as explained above, it has a clear meaning that does not excuse deliberate, knowing conduct.

The bottom line is this: because the interests of marine mammals take precedence over those of the fishing industry under the MMPA, this Court cannot accept Plaintiffs' suggestion that, when the D.C. Circuit cautioned that the "MMPA does not allow for a Solomonic balancing of the animals' and fisheries' interests[,]" *Kokechik*, 839 F.2d at 802 (footnote omitted), it meant that commercial fishermen should have the whole baby.  Therefore, despite Plaintiffs' vigorous defense of an interpretation of the incidental-take definition that would immunize all but the most flagrant and purposeful acts directed toward the marine mammals that commercial fishermen regularly encounter in the ordinary course of business, in this Court's considered judgment, the incidental-take exception to the broad take prohibition must be read narrowly, to give effect to Congress's intent that "[t]he interest in maintaining healthy populations of marine mammals comes first[,]" *id.*, and cannot be read to preference commercial fishing interests in the manner that Plaintiffs suggest.

2.  <u>The Expectations For Regulated Parties Are Sufficiently Clear</u>

Plaintiffs insist that "[i]f . . . the regulations in 50 C.F.R. § 229.2 can be read to

allow NOAA to penalize a taking in which the operator merely 'knew' that whales were associated with fish, then the agency's regulations are unconstitutionally vague and fail to properly articulate the activities for which fishing vessels could be sanctioned." (Pls.' Reply at 11.)  But the ALJ's conclusion that the intentional-take exception does not apply when a commercial fisherman "knowingly set[s] purse seine fishing gear on whales" (ALJ's Decision at 32) is not only legally correct for the reasons explained above (*see supra* Part III.A.1), it also states a rule that is more than sufficient to provide such actors with fair notice of the expected conduct.

As explained, the regulation plainly requires that the act to be excused must be "non-intentional" or "accidental[,]" 50 C.F.R. § 229.2, which means that deliberate/knowing takes—what the ALJ described as "knowing[]" and "intentional" takes (ALJ's Decision at 32)—are unquestionably outside the safe harbor.  And however broad the category of conduct that arguably falls into the "non-intentional" or "accidental" category might be, Plaintiffs cannot suggest, as they attempt to do here, that, given the realities of commercial tuna fishing on the high seas, a fisherman would have no idea what conduct is allowed and what is permitted unless the MMPA scheme is read to excuse all but the purposeful targeting of marine mammals.  (*See* Pls.' Reply at 11.)  In other words, whatever "accidental" might be taken to mean, it most certainly is not the conduct of *knowingly* setting one's purse seine net on a whale.  *Cf. Robinson v. Cheney*, 876 F.2d 152, 163 (D.C. Cir. 1989) ("One to whose conduct a statute clearly applies may not successfully challenge it for vagueness." (quoting *Parker v. Levy*, 417 U.S. 733, 756 (1974))).

To be sure, a fisherman who seeks to determine whether a take is "incidental"

(and thus excused) may find it more or less difficult to ascertain whether the prerequisites of "non-intentional or accidental" conduct have been met on various occasions.  But the fact that a regulation requires the exercise of judgment, or that there is room for disagreement about the existence of a necessary factual predicate, is not a proper grounds for a vagueness challenge.  *See, e.g.*, *Throckmorton*, 963 F.2d at 445 (collecting cases rebuffing vagueness challenges to regulatory language like "so far as practicable," "except when necessary," and "in near proximity" (alteration omitted) (internal quotation marks omitted)); *see also Am. Coal. Co.*, 796 F.3d at 28 (rejecting vagueness argument related to a definition of "fire" that required certain non-flaming material to "present a reasonable chance of bursting into flame").  And, in any event, the definition at issue here is not subject to any such challenge, because no reasonable regulated party who understands  that the safe harbor for incidental takes applies to "non-intentional or accidental" actions would have thought himself authorized to "knowingly set[] [his] net on a whale-associated school" (ALJ's Decision at 32).  *See Am. Coal. Co.*, 796 F.3d at 28 (expressing confidence that a regulation is not vague if a "reasonable" regulated party "will prove able to implement the Secretary's standard in practice").

Thus, Plaintiffs' vigorous attempt to convince this Court that wholly innocent fishermen will get unfairly swept up into the vortex of liability unless the incidental-take exception is broadly construed is entirely unpersuasive.  (*See* Pls.' Reply at 12 (complaining that "there is no regulation that put the Plaintiffs on notice that their Authorization Certificate provided them such limited rights—essentially, only the right to 'take' a marine mammal purely unexpectedly").)  If Plaintiffs truly believe that they

had no notice that they were not authorized to knowingly set the *Pacific Ranger*'s purse seine net on whales, this Court does not know why, because the scope of the protection afforded by the MMPA scheme per the § 1387 authorization is plain on the face of the regulation.  Only accidental or non-intentional (i.e., not deliberate) takes are excused, *see* 50 C.F.R. § 229.2; therefore, setting a purse seine net with knowledge that whales and other marine mammals are swimming among the targeted tuna is not.  All things considered, this reading of the incidental-take exception gives commercial fishing operators as clear a line as ever could be expected.  *See Am. Coal. Co.*, 796 F.3d at 28 (explaining that a law survives a vagueness challenge if it "provide[s] sufficient guidance so that reasonable regulated parties, aware of the goal the regulation seeks to accomplish, have fair warning of what the regulation requires" (internal quotation marks and citation omitted)).  And far from being perplexed or unfairly surprised, a reasonable commercial fisherman who sees whales swimming among the tuna he would like to set his net upon would know that he needs to move on, or risk liability.  *Cf. Throckmorton*, 963 F.2d at 445 ("[I]t is not unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line." (internal quotation marks omitted) (quoting *Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 340 (1952))).

**B.    The ALJ's Findings Of Fact Were Supported By Substantial Evidence**

Plaintiffs' next line of attack is aimed at the ALJ's conclusions regarding Plaintiffs' actions on the dates in question.  Plaintiffs argue, for example, that "the issue in this case primarily is one of witness credibility and the weight of evidence given to assumptions rather than firsthand knowledge," and that the ALJ erred because, rather than relying on the evidence presented, she "based her conclusions about witness

credibility on generalized assumptions and speculation[.]" (Pls.' Mem. at 26.)  With respect to the MMPA counts, Plaintiffs also renew their arguments that are based on the legal premise that NOAA needed to show "that [Plaintiffs] purposefully or intentionally targeted the whales in order to catch fish." (*Id.* at 30.)  As this Court has already explained, in order to hold Plaintiffs liable for the takes, the agency needed to show only that Plaintiffs' conduct could not be characterized as "non-intentional or accidental[.]" 50 C.F.R. § 229.2.  Furthermore, under the substantial-evidence standard, the Court's task is not to determine "whether record evidence supports [Plaintiffs'] version of events, but whether it supports [the agency's]." *AJP Const., Inc. v. Sec'y of Labor*, 357 F.3d 70, 73 (D.C. Cir. 2004) (second alteration in original) (internal quotation marks and citation omitted).  As discussed below, the ALJ's evaluation easily meets this standard, and Plaintiffs' arguments reduce to a mere disagreement with the ALJ's findings of fact, which is not a sufficient basis for this Court to overturn these findings.

### 1. The Agency Presented Sufficient Evidence For A Reasonable Factfinder To Hold Plaintiffs Liable On The MMPA And FAD Charges

The high points of the ALJ's findings of fact are twofold: first, that Plaintiffs' five takes of whales between August 21 and December 11, 2010, were not accidental or non-intentional, and second, that Plaintiffs violated the FAD closure on September 1, 2010, by setting a purse seine net within one nautical mile of a FAD.  There is no dispute that, on each occasion, a fishery observer was on board the *Pacific Ranger*, as CMM 2008-01 required.  *See* CMM 2008-01 Final Rule, 74 Fed. Reg. at 38545–46; (Joint Stipulation of Facts, AR 000440 ¶ 33).[13]  Each observer took contemporaneous

---

[13] Alik Tada was the observer in August.  At the time of the ALJ's hearing, Tada had been a fishery

notes of the experience in a trip journal and filled out contemporaneous fishery-

observer forms.  (*See* ALJ's Decision at 10–16.)  Moreover, during the ALJ's hearing,

each observer testified in a manner consistent with those documents (*see id*.), and the

ALJ expressly found that each observer's testimony was credible (*see id.* at 22, 24–25).

The undisputed record evidence regarding the observers' information and

testimony is more than enough to sustain the ALJ's key findings.  For example,

observer Alik Tada testified that while the *Pacific Ranger* crew was investigating a

school of fish for a set on August 21, a whale was "diving in and out around the school"

(Transcript, AR 001213), and the ship nevertheless set the net on the area in which the

whale was swimming—the whale managed to escape before the net closed completely.

(*See id.* 001175; ALJ's Decision at 10, 22.)  These recollections were consistent with

Tada's trip journal and the contemporaneous forms he had completed regarding the

August 21 trip.  (*See, e.g.*, Tada's Trip Diary, AR 001414 (recounting the set in

question and noting the school was "associated with a live whale"); Tada's Gen-2 Form,

AR 001464 (attesting that he spotted a whale "associated with the school of [fish]

swimming and probably feeding"); Transcript, AR 001178–81 (Tada testifying, *inter

alia*, regarding trip journal and Gen-2 form).)  Furthermore, during the NOAA

investigation, Tada informed the agency that, based on his knowledge of purse seine

fishing, the whale must have been visible to the relevant crew members, including the

fishing master, before they began the set; he reiterated that assertion at the hearing.

---

observer for four years and had been on "10 to 16 trips as an observer on other purse seine vessels" before his trip on the *Pacific Ranger*.  (ALJ's Decision at 10.)  Alfred Siau was present October 18.  At the time of the hearing, he had been an observer for four years and had been on nearly forty fishing trips.  (*See id.*)  Finally, the observer on board on December 11 was Nigel Mamutu, who had been an observer for ten years at the time of the hearing and had in fact been a crew member on a purse seine ship for a year.  (*See id.*)

(*See* Tada's Written Statement, AR 001482; Transcript, AR 001182–83; ALJ's Decision at 22.)

Tada's testimony and contemporaneous documentation for the August 23 and 25 counts reflected the same sort of narrative: he saw a whale that, based on his experience and knowledge, he believed the ship's crew also saw before beginning the purse seine set, and their actions resulted in the whale being caught in the net.  (*See* Transcript, AR 001184, 001186–98 (testifying regarding his experiences and reading into the record assertions from his contemporaneous documentation); ALJ's Decision at 11–13.) Similarly, Tada's trip journal and contemporaneous forms for the August 31 FAD count comported with his testimony at the hearing: he saw a FAD ten meters away from a school of fish; the ship's crew must have seen it; and the ship nevertheless set on the school of fish—in fact, according to Tada, the ship's crew dragged the raft away before setting on the school.  (*See* Transcript, AR 001200–09, 001231 (testifying regarding his observations and reading into the record his contemporaneous documentation); ALJ's Decision at 13–14.)  Similarly, observer Alfred Siau's contemporaneous notes, forms, and testimony about the October 18 incident indicate that, during the crew's investigation phase, he saw a whale that the *Pacific Ranger* crew must have known was there, and the crew nevertheless began the set, resulting in the whale being trapped temporarily inside the net.  (*See, e.g.*, Transcript, AR 001246–47, 001252–55; Siau's Trip Diary, AR 001534 (reporting a school "associate[d with] live whale"); ALJ's Decision at 14–15, 24–25.)

Finally, regarding the December 11 set, Nigel Mamutu, the independent observer who was assigned to the *Pacific Ranger* on that date, testified that the crew members,

and the fishing master in particular, *must* have been able to see the whale that he saw breaching the surface, but the ship nevertheless set the net around two whales that escaped by ripping through the net. (*See* Transcript, AR 001265–67, 001272; Mamutu's Trip Diary, AR 001604; ALJ's Decision at 15–16, 25–26.) He reported this incident and subsequent on-deck discussions to NOAA's investigators, and confirmed at the hearing that the fishing master had told him (Mamutu) that "it was okay to set [on] the whales [if t]he mammals would not be killed" and that "[t]hat was why he set on the whales, then used the work boat to [chase them] to escape." (Transcript, AR 001277; *see also* ALJ's Decision at 26.) Mamutu also reported that the captain had told him that he (the captain) had continually, but unsuccessfully, told the fishing master to stop setting the net on whales. (*See* Transcript, AR 001278; ALJ's Decision at 26.) In one form Mamutu completed—his end-of-trip form—Mamutu characterized the whales "caught in the net" as "unintentional" (Mamutu's Purse Seine Trip Report, AR 001646), and at the hearing, he explained that this meant that the "fish master was trying to make a set" while "trying to avoid the whale, but the whale was finally caught in the net" (Transcript, AR 001275). In that same form, Mamutu stated that "the vessel continue[s] to target whale associated schools[,]" which "had contributed to [the] vessel's successes." (Mamutu's Purse Seine Trip Report, AR 001653.)

To counter the agency's presentation, Plaintiffs presented the *Pacific Ranger*'s "log sheets": documents in which the captain of a vessel reports (via a coding system) the events that happen during a given set. For example, for the set on August 21, 2010, the captain of the *Pacific Ranger* entered a code of "2," which indicates "feeding on baitfish," rather than "6," which would indicate the presence of a "live whale." (Joint

Stipulation of Facts, AR 000441 ¶ 43.)  In none of the log sheet entries at issue here did the captain indicate the presence of a whale or a FAD.  (*See id.* 000441–43 ¶¶ 43, 49, 55, 61, 66, 71.)  Additionally, Captain Freitas, who was a "respondent" at the time and is a plaintiff in this case, testified at the hearing (*see* ALJ's Decision at 27), and claimed to recall nothing about any whale or FAD contact during the trips (*see id.* at 28, 34).  Finally, Robert Virissimo, the Vice President of *Pacific Ranger*'s vessel management company (ALJ's Decision at 3 & n.4) testified that it is company policy not to set on whales (*see* Transcript, AR 001289).  Neither Captain Moniz nor Fishing Master Su testified.

The ALJ received and evaluated all of the testimony and physical evidence presented at the hearing, weighed the two versions of events presented against each other, and found that NOAA had shown by a preponderance of the evidence that Plaintiffs had knowingly and intentionally set on whales, meaning that their takes were neither non-intentional nor accidental within the meaning of the incidental-take exception (*see* ALJ's Decision at 27, 30–32), and Plaintiffs had also "set on a FAD or within close proximity to a FAD" (*id.* at 35).  As mentioned, the ALJ expressly determined that the on-board observers were credible (*see id.* at 22, 24–25), and she "dr[e]w reasonable inferences" from the evidence as a whole about the relevant crew members' "knowledge of the whales prior to the sets" (*id.* at 28–29).  Based upon this Court's own review of the record evidence, the Court has no doubt that the ALJ possessed "the degree [of evidence] which *could* satisfy a reasonable factfinder" that Plaintiffs' takes were not non-intentional or accidental, and that they had set their net on a FAD.  *Allentown Mack*, 522 U.S. at 377 (emphasis in original) (citation omitted).

And that is all that the highly deferential substantial-evidence standard of review requires.  *See id.*; *Orion Reserves Ltd.*, 553 F.3d at 704.

> 2.  <u>Plaintiffs Do Not Come Close To Showing That No Reasonable Factfinder Could Have Reached The ALJ's Conclusions</u>

Plaintiffs have attempted to bear the heavy burden of demonstrating that "no reasonable factfinder" would agree with the ALJ's findings on the instant record, *Orion Reserves Ltd.*, 553 F.3d at 704 (internal quotation marks and citation omitted), but their efforts fall far short in many respects.  First of all, because the ALJ's findings rest in large part on her conclusion that the observers were credible and that their stories made sense, proper deference means that her credibility evaluation is subject to reversal only if it is "hopelessly incredible, self-contradictory, or patently unsupportable."  *Stephens Media, LLC v. NLRB*, 677 F.3d 1241, 1250 (D.C. Cir. 2012) (internal quotation marks and citation omitted).  Plaintiffs (wisely) never actually suggest that the ALJ's determinations are of that nature.  The observers testified consistently with each other and with written averments each had previously produced, and their testimony was that the ship's crew set their nets even though they saw the whales (or the FAD) before beginning the set.  (*See* Transcript, AR 001183, 001190, 001197, 001208–09 (Tada's testimony); *see id.* 1255 (Siau's testimony); *see id.* 1266 (Mamutu's testimony).)  This Court, which is sitting now as an "appellate tribunal[,]" *Silver State Land, LLC v. Schneider*, 145 F. Supp. 3d 113, 123 (D.D.C. 2015) (internal quotation marks and citation omitted), has no intelligible way to second-guess the ALJ's impressions of the witnesses' demeanor.  *See Black*, 121 F. Supp. 3d at 89.  And such impressions are undoubtedly a sufficient basis upon which a "theoretical reasonable factfinder" could conclude that these takes were neither non-intentional nor accidental and that, indeed,

the *Pacific Ranger* crew had set on a FAD. *Cumberland Coal Res., L.P. v. Fed. Mine Safety & Health Review Comm'n*, 717 F.3d 1020, 1028 (D.C. Cir. 2013) (internal quotation marks omitted) (quoting *Sec'y of Labor v. Keystone Coal Mining Corp.*, 151 F.3d 1096, 1104 (D.C. Cir. 1998)).

Plaintiffs' rejoinder to all this is nonsensical.  For example, they claim that the ALJ's conclusions fail the substantial-evidence test because the ALJ (allegedly) rested her decision on the lack of credibility of *Plaintiffs'* witnesses, due to the fact that they did not have contemporaneous records supporting their testimony.  (*See* Pls.' Mem. at 27 (complaining that "the ALJ based her conclusions about the captains' [sic] credibility on generalized assumptions about the lack of contemporaneous records"); *see also id.* at 26 (asserting that the agency "failed to present any substantial evidence impeaching Plaintiffs['] witnesses").)  This argument is baffling because, as far as this Court can tell, the ALJ said nothing of the sort.  That is, far from finding Plaintiffs' witnesses mendacious, the ALJ expressly stated that Plaintiffs' witnesses "did not seem insincere[,]" but that their testimony "[could not] overcome the strength of the three different independent observers' consistent testimony and records[.]"  (ALJ's Decision at 29; *see also, e.g., id.* at 24 ("Mr. Tada's immediately contemporaneous notations in the forms and in his journal, his credible testimony and refreshed recollections at [the] hearing, his timely Purse Seine Trip Report reflections, and his written statement months later to the NOAA . . . together are sufficient evidence that [Plaintiffs knowingly set on a whale in the August counts]."); *id.* at 25–27 (same point for the October and December counts); *id.* at 35–36 (FAD count).)  It misses the point to attack the ALJ's decision on the grounds that the agency did not "impeach[]" Plaintiffs'

witnesses (Pls.' Mem. at 26), when the ALJ never purported to draw that sort of negative inference about Plaintiffs' witness testimony, and instead merely commented positively about the contemporaneous records that backed the observers' testimony (which is, by the way, *precisely* what one would expect a careful judge to do when evaluating such evidence). In short, the ALJ simply found that the evidence Plaintiffs presented did not outweigh the evidence NOAA offered. And *that* conclusion did not require the ALJ to think (purportedly erroneously) that Plaintiffs' witnesses were lying; it only required her to weigh the evidence presented, which she undoubtedly did.

Plaintiffs' contentions about the ALJ's consideration of evidence are also logically incoherent on their own terms. Plaintiffs' point seems to be that the ALJ acted unfairly, insofar as she found Plaintiffs' witnesses unbelievable due to their lack of sufficient contemporaneous evidence, because Plaintiffs were not "required" to keep such notes and records, and thus had little opportunity to amass the kinds of contemporaneous evidence that the observers had. (*Id.* at 28.) Plaintiffs do not make an attempt to explain why, even if true, Plaintiffs' purportedly unavoidable failure to document their purse seine sets sufficiently makes the ALJ's decision defective. It appears that Plaintiffs would have this Court hold it is improper for a judge to weigh the evidence that is *actually* presented because there *might* have been documentary evidence that a more equitable documentation system could have permitted Plaintiffs to unearth and retain. Plaintiffs offer no authority for that implicit assertion, which is not surprising, because this Court cannot fathom a case in which such a parallel universe of potentialities would be deemed to diminish the judge's authority to evaluate the evidence that the parties do discover and present.

With respect to Plaintiffs' related suggestion that they would have had more contemporaneous evidence had NOAA not violated a Commission measure that purportedly gives vessel operators and captains a right to "[t]imely notification from the observer . . . on completion of the observer's trip of any comments regarding the vessel operations[,]" as well as the right to "review and comment on the observer's report, and . . . the right to include additional information deemed relevant or a personal statement" (Pls.' Mem. at 29 (quoting CMM 2007-01, AR 001039)), this Court notes that Plaintiffs never raised this argument before the ALJ, and thus, this Court will not consider it. *See Tindal v. McHugh*, 945 F. Supp. 2d 111, 129 (D.D.C. 2013) ("[T]he D.C. Circuit has consistently held that courts are bound to adhere to the hard and fast rule of administrative law, rooted in simple fairness, that issues not raised before an agency are waived and will not be considered by a court on review." (internal quotation marks omitted) (quoting *Coburn v. McHugh*, 679 F.3d 924, 929 (D.C. Cir. 2012))).  Notably, the waiver "principle applies to legal, as well as factual, arguments[,]" *id.* at 129 (citation omitted), and it is demanding: "the standard for waiver in administrative law cases focuses on whether the 'specific argument' put forth by the plaintiff was raised before the agency[,]" *id.* at 129–30 (quoting *Koretoff v. Vilsack*, 707 F.3d 394, 398 (D.C. Cir. 2013)).  The waiver rule is also well founded, and the reasons for its adoption are fully applicable here.  *See Salt Lake Cmty. Action Program, Inc. v. Shalala*, 11 F.3d 1084, 1087 (D.C. Cir. 1993) (observing that the "principal policy underlying the waiver rule is that 'judicial review might be hindered by the failure of the litigant to allow the agency to make a factual record, exercise its discretion, or apply its expertise.'" (quoting *R.R. Yardmasters of Am. v. Harris*, 721 F.2d 1332, 1338

(D.C. Cir. 1983))); *see also Mingo Logan Coal Co. v. EPA*, No. 14-5305, 2016 WL 3902663, at \*6 (D.C. Cir. July 19, 2016) (explaining that administrative waiver means that "courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice" (internal quotation marks omitted) (quoting *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952))).

Finally, to the extent that Plaintiffs seek to undermine the ALJ's findings by relying on Mamutu's statement that catching the two whales in December was "unintentional" and that the fishing master was "trying to avoid" the whales (*see* Pls.' Mem. at 37 (referencing Transcript, AR 001275)), their efforts are unavailing.  Properly understood, Mamutu's testimony was that the ship's crew saw the whales among the fish but nevertheless conducted the set (*see* Transcript, AR 001272, 001275–76), and thus his testimony *supports*, rather than rebuts, the ALJ's conclusion that Plaintiffs should be liable.  Moreover, and even more important, Mamutu's statement is hardly the final word: it is at most one piece of evidence, and even if Plaintiffs are correct that disparate conclusions can be drawn from it, the ALJ was certainly permitted to draw the conclusion she reached in light of the rest of Mamutu's documentation and testimony, and the testimony and evidence presented from all of the observers regarding the *Pacific Ranger*'s pattern of conduct.  *See Siegel v. SEC*, 592 F.3d 147, 155 (D.C. Cir. 2010) ("The reviewing court may not substitute its own judgment for the agency's choice between two fairly conflicting views, even if that court would justifiably have made a different choice had the matter been before it *de novo*."  (internal quotation marks and citation omitted)).

And therein lies the fundamental problem with Plaintiffs' painstaking march through the evidence pertaining to every MMPA count (and the one FAD count) and their highlighting of the points that favor them: Plaintiffs' characterizations of the evidence might be excellent arguments to make to the ALJ, but the ALJ rejected Plaintiffs' contentions, and in *this* forum, Plaintiffs are simply asking the Court to engage in impermissible rebalancing of the evidence. *See, e.g.*, *Orion Reserves Ltd.*, 553 F.3d at 704. The Court has already explained why a reasonable factfinder considering the evidence presented could have deemed these Plaintiffs' actions to violate the MMPA in a manner that was outside the safe harbor, and nothing Plaintiffs offer undermines that point. Indeed, with respect to the FAD count, it is telling that Plaintiffs themselves admit that "the agency's evidence was no more persuasive than Plaintiffs[' evidence]" (Pls.' Mem. at 40), which means, of course, that the ALJ merely found one of the parties' evidence-backed stories more convincing than the other. When such is the case, it is clear beyond cavil that a reviewing court cannot find that an ALJ committed reversible error. *See Siegel*, 592 F.3d at 155; *Throckmorton*, 963 F.2d at 444 (observing that the judicial "function is to determine only whether the agency . . . could fairly and reasonably find the facts as it did" (alteration in original) (internal quotation marks and citation omitted)).

### C. The Penalties Imposed Were Sufficiently Explained And Were Not Unconstitutionally Excessive

Plaintiffs' final line of attack is aimed at the penalties that the ALJ imposed for their MMPA and FAD-closure violations. Plaintiffs insist that the penalty amounts— $72,000 for the FAD violation and $55,000 total for the five MMPA violations—"are both (1) arbitrary and capricious, and (2) unconstitutionally excessive[,]" primarily

"[b]ecause the evidence on which the penalties assessed by the ALJ are based [was] evidence that does not support a penalty[.]"  (Pls.' Mem. at 40.)  To the extent that this argument rehashes the previously considered (and rejected) contentions that Plaintiffs should not be held liable at all, or that there was insufficient evidence to support the ALJ's decision, it necessarily fails.  But Plaintiffs' objection to the penalty amounts is overruled for other reasons as well.

First, with respect to the charge that the penalties are arbitrary and capricious, the penalties must be upheld if the ALJ "articulate[d] a satisfactory explanation for [her] action including a rational connection between the facts found and the choice made."  *FirstEnergy Serv. Co. v. FERC*, 758 F.3d 346, 352 (D.C. Cir. 2014) (first alteration in original) (internal quotation marks and citations omitted); *see also Collins*, 736 F.3d at 524.  The ALJ clearly did so, beginning with her recognition that the NOAA regulations and the Magnuson-Stevens Act each provides a list of non-exclusive factors to guide her assessment of the appropriate penalty.  (*See* ALJ's Decision at 36); *see also* 15 C.F.R. § 904.108(a) (listing factors such as "the nature, circumstances, extent, and gravity of the alleged violation[,] the respondent's degree of culpability, any history of prior violations, and ability to pay" as considerations when a penalty is assessed); *see also* 16 U.S.C. § 1858(a) (same).  Plaintiffs appear to find fault with the ALJ's purported failure to consider a number of circumstances that she *could have* relied upon to reach a more lenient result (*see, e.g.*, Pls.' Mem. at 42–44 (asserting that the maximum penalty for the MMPA violations should not have been imposed, due to the "realities of purse seine fishing[,]" the purportedly "low" value of the catch, the fact that the penalty imposed on someone who killed a whale could go no higher than the

$11,000 penalty per violation imposed on them for what Plaintiffs say is less culpable behavior, and the "relatively small" amount of fish obtained from the FAD set)).  But the ALJ considered those matters (*see, e.g.*, ALJ's Decision at 38, 41), and nevertheless concluded that they were insufficient to warrant a lesser penalty under the circumstances presented, which is the hallmark of reasoned decisionmaking.

What is more, the ALJ's opinion explains the penalty decision at length.  For example, the ALJ observes that the whales Plaintiffs took were physically restrained in purse seine nets and were in fact sometimes "chased from the net . . . resulting in further harassment."  (*Id.* at 38.)  Moreover, the ALJ explicitly mentions the "[e]conomic benefit" that Plaintiffs had obtained from their actions and the need for future deterrence, noting in particular that even the maximum $11,000 penalty for each count would leave Plaintiffs with a net gain of over $31,000 from their illegal behavior. (*Id.*)  She concludes that the MMPA penalties had to be sufficient to ensure that these parties, and others, would not treat illegal behavior "as a cost of doing business[.]"  (*Id.* at 39 (internal quotation marks omitted).)[14]  And on the FAD front, she notes that, because CMM 2008-01 only lasted three years, "each violation . . . has the potential to significantly undermine" the treaty, and that Plaintiffs gained a competitive advantage by breaking the rules and obtaining tuna worth $36,000 from that set.  (*Id.* at 42.) The ALJ also emphasizes the egregious nature of the violation, pointing out that Plaintiffs set on a school only *ten meters* from a FAD, when the regulation barred setting on schools within 1852 meters of a FAD.  (*See id.*)  Plaintiffs have not demonstrated that the APA requires anything more than these sorts of careful explanations.

---

[14] She did not, as Plaintiffs contend, accuse them of having acted thusly on *this* occasion (*see* Pls.' Mem. at 42), but only pointed out that penalties must help dissuade Plaintiffs and others from doing so.

Nor can Plaintiffs contend that the penalties imposed here are "unconstitutionally excessive." (Pls.' Mem. at 40.) "A civil penalty violates the Excessive Fines Clause [of the Eighth Amendment] if it 'is grossly disproportional to the gravity of' the offense." *Collins*, 736 F.3d at 526 (quoting *Bajakajian*, 524 U.S. at 334). As the Supreme Court has said, "judgments about the appropriate punishment for an offense belong in the first instance to the legislature[,]" *Bajakajian*, 524 U.S. at 336 (citation omitted), and it is doubtful that a penalty that is nearly $70,000 *less* than the total maximum penalty authorized by law could ever be grossly disproportional to the offense's gravity. *See Pharaon v. Bd. of Governors of Fed. Reserve Sys.*, 135 F.3d 148, 157 (D.C. Cir. 1998) (rejecting Excessive Fines argument because "the penalty is proportional to [the] violation and well below the statutory maximum"); *cf. United States v. Sepulveda-Hernandez*, 752 F.3d 22, 37 (1st Cir. 2014) ("When the [penalty] is less than the maximum authorized fine, [one] who purposes to challenge its constitutionality faces an especially steep uphill climb." (citation omitted)); *United States v. Mackby*, 221 F. Supp. 2d 1106, 1110 (N.D. Cal. 2002) (observing that "federal courts have consistently found that civil penalty awards in which the amount of the award is less than the statutory maximum do not run afoul of the Excessive Fines Clause" and collecting cases).

In any event, for all the reasons that the ALJ ably elucidated, these fines clearly "bear some relationship to the gravity of the offense[s] that [they were] designed to punish." *Bajakajian*, 524 U.S. at 334 (citation omitted). Consequently, Plaintiffs' claim that this Court should vacate or reduce these penalty assessments must be rejected.

## IV.    CONCLUSION

When Congress enacted the MMPA, it sought to grant marine mammals pride of place in the world of commercial fishing.  The resulting strict-liability statute prohibits "takes" (broadly defined) in order to place the onus on fishermen to adjust their behavior when they encounter protected species, and the incidental-take definition in 50 C.F.R. § 229.2 clearly implements this goal in a way that excuses only truly blameless (accidental) takings, not takings that are knowing and deliberate.  Plaintiffs offer a reading of the regulation that, contrary to its plain text and broad context, would neuter the take moratorium by placing fishing interests above the wellbeing of whales, and they appear to have pursued this course largely based on their own misconception regarding the scope of the protection afforded to them by the incidental-take authorization that NOAA has issued.  But the ALJ rightly understood that the incidental-take exception excuses only those takes of marine mammals that are accidental or non-intentional, and based on the evidence presented to her during the administrative proceedings, the ALJ reasonably determined that Plaintiffs' knowing and intentional (i.e., deliberate) takes of whales did not meet this standard.  This Court concludes that the record evidence easily supports this finding, as well as the ALJ's additional conclusion that the crew of the *Pacific Ranger* set the purse seine net on or near a FAD, and this is especially so when the Court applies the highly deferential standard of review to its evaluation of the ALJ's findings of fact.  And Plaintiffs have also failed to establish that there is any factual or legal basis for this Court to overturn the penalties as arbitrary or excessive.

Therefore, as set forth in the order accompanying this opinion, Plaintiffs' motion for summary judgment is **DENIED**, Defendants' motion for summary judgment is **GRANTED**, and **JUDGMENT WILL BE ENTERED IN DEFENDANTS' FAVOR**.

DATE:  September 30, 2016

*Ketanji Brown Jackson*

KETANJI BROWN JACKSON
United States District Judge